UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PATRICIA KAPNER,

Plaintiff,

vs.

**COMPLAINT**
Civ. No.

RIVERSIDE WINE & LIQUOR, INC.,
MARCIA ISNER, BEN ISNER,

**JURY TRIAL DEMANDED**

Defendants.

## INTRODUCTION

1.       This is an action to recover from an unlawful conspiracy and enterprise

among distributors of retail liquor  to (a) terminate Ms. Kapner from

Riverside Wine and Liquor for refusing to participate in an unlawful

continuing practice of ignoring New York State and Federal regulations

involving the international and interstate sale of contraband liquor; and (b)

conspire to boycott  Kapner from the retail liquor industry because she

lodged complaints against the defendants with the New York State Liquor

Authority pursuant to Chapter 478 of the Laws of 1934, known as the

Alcohol, Beverage Law.  This Complaint is brought for violations of the

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 961 et

seq. ("RICO"), and violations of common law tortious interference with

business relations, tortious interference with prospective economic

advantage, and retaliation under the New York Labor Law § 740.

Page -1-

## PARTIES

2.      Patricia Kapner ("Plaintiff") is a resident of the County of Monroe, and
State of New York.

3.      Upon information and belief, Riverside Wine & Liquor, Inc., ("Riverside") is
a corporation duly organized and operated under the laws of the State of
New York, or alternatively, is licensed to do business in the State of New
York, and does in fact do business in the State of New York. Additionally,
defendant is an employer for the purposes of application of the laws and
statutes cited herein.

4.      Upon information and belief, Ben Isner (hereinafter "B. Isner") is a
resident of the State of North Carolina.

5.      Upon information and belief, Marcia Isner, (hereinafter "Isner") is a
resident of the County of Monroe and State of New York and has
maintained her residency in the County of Monroe and State of New York
for the last five years and at all times hereinafter mentioned.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction pursuant to 18 U.S.C § 1964

(RICO).  The Court also has subject matter jurisdiction pursuant to 28

U.S.C § 1331 (federal question).

7.      Venue is proper in this district pursuant to 28 U.S.C.§ 1391, 18 U.S.C §

1965(a) as one or more of the defendants can be found in, reside in,

and/or transact substantial business in this District..

## FACTS

### I. Background

8.      The  business of Defendant, Riverside, is a wholesale business in the

marketing of sales of alcoholic beverages under a license issued by the

New York State Liquor Authority ("NYSLA").

9.      On or about 1994, Defendant, Marcia Isner, Maurice Isner and Fredric

Schade, took ownership of Riverside as shareholders of Riverside.

10.     At all times herein relevant, Maurice Isner was the President and a

Director of Riverside.

11.     At all times herein relevant, Marcia Isner was the Secretary/Treasurer and

a Director of Riverside.

12.     At all times herein relevant, Fredric Schade was a Vice-President
        and Director of Riverside.

13.     At all times herein relevant, Plaintiff, Kapner was hired by Riverside Wine
        & Liquor, Inc. ("Riverside") the defendant in October, 1994 as the
        "Controller".

14.     At all times hereinafter mentioned, Kapner acted in accordance to her
        responsibilities as Controller.

15.     That from 1994 to the present date, Riverside has been operating its
        usual business as a wholesale liquor distributor.

16.     Throughout the course of her employment with defendant, Plaintiff
        performed her job in an exemplary manner.

17.     Notwithstanding his ownership interest in, his role as an officer of, and his
        duties as an employee of Riverside, some time between 1994 and 2008,
        Schade began to conduct himself in a manner which was contrary to
        Riverside's business interests.

18.     More specifically, he engaged in fraud, deceit, embezzlement, theft,
        breach of fiduciary duty, faithless acts, and performed, conducted and
        effectuated those acts through lies, conspiracy, deception, and the like.

19.      That more specifically, the conduct that Schade engaged in, as referenced in the preceding paragraph, falls to at least three categories: (i) conducting a competitive side business illegally importing alcohol into the United States; (ii) embezzling from Riverside by submitting bills for personal items (car parts and repair services) to Riverside; and (iii) theft of company assets.

## II.  The Conspiracy to Import Contraband Liquor

20.      That some time prior to 2008, upon information and belief, at least as early as 2000, Schade became involved in a conspiracy to divert business opportunity away from Riverside, in addition to importing and smuggling illegal alcoholic beverages into the United States for his own financial gain.

21.      That more specifically, Riverside had a relationship with a supplier operating out of Cognac, France, known as "Hardy Cognac."

22.      That Riverside would import and supply products from Hardy Cognac throughout New York State.

23.      That Schade entered into a relationship with, upon information and belief, one of Hardy Cognac's employees, Benedicte Hardy, to import cognac into the United States for sale, separate and apart from Riverside's business, illegally  under Riverside's assets and liquor license.

24.     That more specifically, while he was an officer, employee, shareholder, and Director of Riverside, Schade set up a separate side business in his own name for the purpose of importing, in competition with and diverting business opportunity from Riverside, Hardy Cognac products and wine products into the United States for his own personal financial gain under Riverside's assets and liquor license.

25.     That more specifically, Schade set up various e-mail accounts which were concealed from all other owners of Riverside, including Plaintiff, the Controller, and through numerous bank accounts, Federal Express and mail packages, arranged for cognac products to be imported using Riverside's premises, assets and liquor license outside of Riverside's business to be imported into the United States, which, thereafter, would be removed from Riverside's premises and sold directly to customers in discrete meetings, for his own personal gain.

26.     That the amount of money derived by Schade and the loss of revenue to Riverside is in an amount to be determined had these products been imported directly into the United States legally and not illegally through Riverside's business and sold to customers within New York State.

27.     That in addition, Schade's conduct in so doing was illegal, unknown to Riverside, contrary to Riverside's business, and placed the Riverside business at great risk.

28.     That in the second week of July 2008, Plaintiff, as the Controller of the business, had computer problems with her personal computer which was essential to operate the business.

29.     Defendants usual IT professional reassigned Plaintiff to the Company's PC that was used by Schade.

30.     Schade left windows to email accounts open which revealed that Schade was corresponding with people and entities involving importation of alcohol, specifically cognac, which did not involve Riverside's business.

31.     There were also other emails which did involve Riverside's business but which none of the other key employees of Riverside knew about.

32.     Plaintiff was most concerned about those emails which appeared to involve importation of liquor that was totally separate and apart from Riverside's business but from one of its suppliers, but at the time did not fully comprehend what was going on.

33.     For example, an email dated March 19, 2007 from Benedicte Hardy to Schade, Hardy direct Schade to transfer $29,000.00 to an entity and in turn, would deduct an invoice for cognac vintages. Such emails had nothing to do with Riverside's business.

34.     The emails demonstrate that Benedicte Hardy was directing Schade to transfer numerous bottles of liquor, including cognac vintages from as early as 1977 directly to individuals, and that these would, in turn, be billed for by Benedicte Hardy.

35.     It should be noted that Riverside's liquor license does not permit shipment to individuals, and the emails had nothing to do with Riverside's business.

36.     Schade shipped cognac into the United States in violation of Riverside's business and the New York State Liquor Laws.  An investigation is pending.

37.     Corresponding notes have since been discovered on Schade's desk which seem to track shipment of the liquor.

38.     Invoices for various varieties of Hardy Cognac bearing Fredric Schade's personal Post Office Box were located.

39.     Schade also issued commission statements for the sale of liquor outside Riverside's business district (outside New York State).

40.     Riverside was venued for sale only in New York State.

41.     Plaintiff discovered records which revealed that Schade was involved in transferring funds to bank accounts in France on behalf of Benedicte Hardy and her significant other, Ludovic Stacke, who himself, is an exporter of French wine, and for sales of cognac liquor in such places as Russia and the U.K. in addition to customers across the U.S.

42.     Plaintiff informed Defendant Isner that she discovered these records.

43.     Plaintiff kept Isner informed as began uncovering Schade's covert activity.

44.     Plaintiff told Marcia Isner because Maurice Isner had been diagnosed with dementia and his conditions appeared to be getting worse.

45.     Maurice Isner seemed unable to appreciate the serious threat that Schade's activities posed to Riverside and to him Marcia as shareholders.

46.     Riverside is not authorized to distribute liquor anywhere but New York State, and is not licensed to distribute anywhere but New York State.

47.     In a telephone conversation on August 7, 2008, Benedicte Hardy informed Plaintiff that she was illegally importing bottles of Jacques Hardy's private collection of cognac into the United States.

48.    Hardy had no other way to import the cognac and she was in dire financial
       need. Hardy further stated that Riverside was used as a shipping
       convenience, using Schade as a co-conspirator.

49.    Schade imported the illicit cognac into Riverside's warehouse, where
       Schade would meet the container of Riverside's usual legal order of
       cognac, but in addition, concealed therein and mislabeled, was the illicitly
       imported cognac.

50.    Schade would then secretively remove the illicitly imported cognac, and
       distribute that throughout the United States, transferring funds back to
       Benedicte Hardy in France through the U.S. Postal Service, Federal
       Express and other means.

51.    Schade personally profited as evidenced by his commission statements
       and at a minimum, was diverting Riverside's corporate opportunity to sell
       this expensive private collection of cognac within New York State.

52.    In addition, Benedicte Hardy's significant other, Ludovic Stacke, a wine
       exporter in France also appears to have been involved in similar illegal
       import/export practices with Schade.

53.     Schade disparaged Riverside saying, among other things, that he "is" Riverside, that Maurice Isner is no longer capable of running the Company, and that the Company was "going under."

54.     Plaintiff was informed by Riverside's customers and suppliers that Schade also told customer and suppliers that he was going to take over Riverside or form his own distributorship before he resigned.

55.     On July 22, 2008, shortly after discovering Schade's breaches of fiduciary duty, Schade was confronted by Plaintiff, who asked him what he was doing.

56.     Schade responded in short, "I stole from you," among other things.

57.     Schade confirmed this in writing and signed a resignation letter immediately.

58.     On or about July, 2008 and continuing therefrom, Plaintiff became aware that Schade was engaged in the sale of *contraband* liquor in violation of regulations promulgated by, inter alia, the New York State Liquor Authority ("NYSLA" or "the Authority,") and which activities had an affect on both interstate and foreign commerce.

59.    In or about the same time period, Plaintiff hired Attorney William Smith to assist in the investigation of Schade and his activities and to protect Riverside and shareholders Defendant, Isner and Maurice Isner.

60.    On or about August, 2008, Attorney William Smith interviewed Glenn Whitney and Curtis Grant, employees of Riverside since its inception.

61.    Attorney Smith tape recorded Grant stating that Schade was putting company inventory into his own car, and not telling anyone and that this had been going on for more than 10 years.

62.    Grant admitted to preparing Federal Express labels and packaging vintage cognac that illegally came into the United States.

63.    Grant also admitted to packaging illegal cognac for Riverside drivers to deliver to private trucking company in Buffalo without their knowledge of what was in the packages.

64.    Grant further admitted to assisting in sending said contraband to collectors all over the United States.

65.    Grant further admitted that he knew it was not on the "up and up."

66.    Attorney Smith advised Marcia Isner to "let Grant go," which Marcia Isner refused to do, because Grant "had the evidence".

67.     The Federal Express receipts for over 10 years went missing shortly
        thereafter.

68.     Plaintiff became very concerned about her own personal knowledge
        regarding these events, and in particular, about the fact that evidence had
        gone missing.

69.     After the interview, Grant hired his own counsel and gave up the
        company's cell phone.

70.     Plaintiff confronted Marcia Isner  with the information concerning Grant
        and informed them that she felt threatened and unsafe when she worked
        at night alone when Grant was on the premises.

71.     While Maurice Isner's dementia rendered him incapable of appreciating
        Plaintiff's concerns and Defendant, Marcia Isner acted nonchalantly and
        refused to terminate Grant because he "*had the evidence*".

72.     As a result of the cumulative effect of the foregoing matters, and based
        upon her own investigation into the matters at hand, Plaintiff filed a formal
        complaint with the New York State Liquor Authority ("NYSLA")  on or
        about August 7, 2008.

73.     Riverside commenced a formal action against Schade in Monroe County
        Supreme Court on or about September of 2008.

74.     During the course of that litigation, Plaintiff uncovered 4000 documents
        consisting of emails and invoices detailing that Schade had shipped
        contraband liquor into the country and distributed throughout the country
        in violation of laws and licensing regulations.

75.     Plaintiff kept Marcia Isner fully informed of the discovery of these
        documents but Marcia Isner showed little concern.

76.     Plaintiff inherited an assignment from Schade: an overseas Bordeaux
        Wine clearing for a retail store that was worth over $700,000 to Riverside.

77.     In November, 2008, Plaintiff discovered that the retailer had been
        importing the wine using Riverside's import license and bond illegally.

78.     Plaintiff immediately advised Marcia Isner.

79.     Marcia Isner instructed Plaintiff that Plaintiff and the retailer were to "do
        whatever it takes" to bring the wine into the country.

80.     Plaintiff refused to participate in what she believed was illegal activity and
        Marcia Isner completed the transaction and obtained clearing fees for
        Riverside.

81.     Once Schade left Riverside, Plaintiff's workload increased significantly.

82.     In addition to her usual workload and that left by Schade, Plaintiff was
        assigned as the primary contact with Riverside's legal counsel to respond
        to almost daily e-mails and phone calls to and from counsel and Plaintiff
        asked Marcia Isner to hire additional help to assist Plaintiff to handle the
        escalating work load.

83.     Marcia Isner refused.

84.     Plaintiff reported all illegal activity to the New York State Liquor Authority.
        Plaintiffs reports included the illegal importation of contraband liquor, the
        illegal distribution of liquor outside New York, and that Schade had
        opened four different bank accounts under false names and into which he
        deposited money for his benefit from the sale of contraband liquor.

85.     Plaintiff contacted the office of Thomas Butler, New York State Liquor
        Authority Senior Attorney and spoke with Mr. Butler's assistant, Terry,
        regarding the removal of Schades' name from Riverside's NYSLA
        corporate license.

86.     Plaintiff was advised that due to Defendant Isner's age and Maurice
        Isner's health and age, it would be in Riverside's best interest to have
        Plaintiff's name on the license.

87.     Maurice Isner gave his oral approval over to the phone to Terry. Plaintiff
        received the necessary paperwork and Defendant Isner instructed Plaintiff
        to get fingerprinted which she did.

88.     Marcia Isner then refused to allow Plaintiff to be named on the corporate
        license after Defendant B. Isner told Defendant Isner that Plaintiff had lied
        about even talking to the Authority.

89.     Marcia Isner continued to discount Plaintiff's concerns about the impact
        of illegal activity on Riverside, and the deleterious effect the heavy
        workload was having on Plaintiff's health.

90.     Marcia Isner continued to ignore Plaintiff's request that qualified help be
        hired to assist with the increasing backlog of work.

91.     As a result, Plaintiff lost weight and had difficulty sleeping and, in January
        2009, sought the care of a therapist to help her deal with the stress and
        chaos at Riverside.

92.     In January 2009, during a dinner with Marcia Isner, Plaintiff's husband
        informed Isner that Plaintiff would resign if Isner continued to ignore
        Plaintiff's request for additional help at Riverside.

93.     Soon thereafter, Robin Bellinger was hired to assist Plaintiff at Riverside.

94.     After Bellinger began work at Riverside and despite their exemplary
        performances, Marcia Isner began to treat Bellinger and Plaintiff in a rude
        and hostile manner.

95      In early February, 2009, unbeknownst to Plaintiff, Marcia Isner met with
        Riverside's legal counsel in the Schade litigation, and caused the lawsuit
        to be withdrawn cancelling a highly- anticipated deposition of Grant, the
        warehouse manager who was involved in the illegal activity.

96.     Plaintiff had been counsel's primary contact for Riverside, Plaintiff was
        immediately informed by counsel that the lawsuit against Schade would
        be discontinued.

97.     Plaintiff was devastated by this news.

98.     At all times Plaintiff's actions had been guided by her duties and
        responsibilities as Controller to protect Riverside, its Shareholders, and to
        comply with the law governing Riverside's business.

99.     Because of the continued cloud of illegal activity that now seemed to taint
        all Riverside directors that could also taint Plaintiff, and the heightened
        animosity Marcia Isner directed toward Plaintiff, and threats made by
        Grant against Plaintiff, Plaintiff felt she had no other option but to resign
        and did so on February 6, 2009.

100.     Despite being forced out of Riverside, Plaintiff advised Marcia Isner and
         Riverside **in writing** that she would complete all work that needed to be
         done either at Plaintiff's home office using her own computer modern or
         after hours when Grant was not on the premises.

101.     Shortly thereafter, Marcia Isner brought her son, Defendant Ben Isner,
         into Riverside's operations, who never exhibited any interest in Riverside's
         work during the 15 years of its operation.

102.     Instead of being facilitative and collaborative so that Riverside's work
         could be done, Defendant Ben Isner threatened and harassed Plaintiff,
         changed passwords from all accounts and locked Plaintiff out of the
         company all in an attempt to dissuade her from making further complaints
         and /or from cooperating with the NYSLA.

103.     Henceforth, Plaintiff was unable to complete necessary work for
         Riverside.

104.     Without notice to Plaintiff and unbeknownst to her for a month,
         Defendants caused Plaintiff's and her family's health insurance to be
         cancelled.

105.     Upon information and belief, Defendants hired or caused to have Plaintiffs
         personal phones, computers and fax machine to be "hacked" and her
         personal communications to be wiretapped.

106.     On or about March, 2009, after experiencing serious problems with her
         phones, computers, and fax machines, Plaintiff hired Vinnie Burcz, a
         computer professional whom she had hired for Riverside's computer
         needs, to come to her home and remove all access including modems
         and sonic wall that allowed Riverside any connection to Plaintiff's
         computer.

107.     Unbeknownst to Plaintiff, Burcz, in collaboration with Defendant Ben
         Isner, instead installed a remote AWHost 32 to Plaintiff's computer
         allowing Riverside access to Plaintiff's files.

108.     Burcz also installed hidden files and malicious spyware all of which was
         discovered by a subsequent licensed computer professional hired by
         Plaintiff.

109.     Defendants jeopardized Plaintiff's personal credit regarding two Riverside
         company vehicles because in her capacity as Controller, Plaintiff signed
         the purchase order for these vehicles.

110.     After Plaintiff's constructive discharge on February 6, 2009, Riverside
         refused to pay for the vehicles and the financing banks began demanding
         payment from Plaintiff.

111.     Marcia Isner refused to negotiate with Plaintiff concerning the vehicles
         and the banks' demands and Plaintiff was forced to purchase Riverside's
         vehicle in order to preserve her own credit.

112.     The wrongful activities of Schade, Riverside and Defendant Isner, which
         Plaintiff, according to her duties and responsibilities as employee and
         shareholder, brought to Defendant Isner's and Riversides' attention and
         urged them to investigate, report and correct, were in violation of laws,
         regulations, and presented a substantial and specific danger to the public
         health or safety of consumers and customers.

113.     As a result of the illegal activity and Plaintiff's reporting of such activity to
         proper authorities, the resulting animosity by Defendant ]suer toward
         Plaintiff, the overburdening of Plaintiff with work, and the threatening
         atmosphere at work, Plaintiff was forced to resign her employment with
         Riverside on February 6, 2009.

114.     As a result of her forced resignation and the continued harassment by
         Defendants, Plaintiff has suffered emotionally, physically and financially.

115.     After Plaintiff's forced resignation, Marcia Isner told all other employees
         that she did not know how long Riverside would last because of Plaintiff
         and that there was not enough money to pay for health insurance
         because of Plaintiff.

116.     On or about February, 2009,  to the present, suppliers began calling
         Plaintiff's cell phone, asking her why Riverside has not responded to
         unpaid invoices.

117.     Plaintiff did not understand why Riverside was not paying the company
         bills and neither did the suppliers.

118.     Riverside unilaterally cancelled Plaintiff's family health insurance.

119.     Plaintiff was forced to correct this on her own after learning her family was
         without health insurance for four weeks.

120.     Plaintiff continued to be harassed by Isner, regarding two company
         vehicles that are presently in the company's name.

121.     Plaintiff was forced to purchase out of her own pocket one of the vehicles
         for the very reason of saving her own credit, since the company was not
         paying for the vehicle.  Plaintiff was harassed by banks regarding these
         vehicles.

122.     The wrongful activities of defendants, which Plaintiff brought to the
         owners' attention and urged them to investigate, report and correct, were
         in violation of several laws, rules or regulations, and presented a
         substantial and specific danger to the public health or safety of consumers
         and customers. The laws rules and regulations defendant violated
         include, but are not limited to Chapter 478 of the Laws of 1034 known as
         the Alcohol Beverage Control Law.

123.     As a result of Plaintiff's statements and inquiry to defendant, as well as
         her desire to stop the ongoing violations, Plaintiff, resigned on February 6,
         2009.

124.     After Plaintiff resigned, Marcia Isner told all other employees that she did
         not know how long Riverside would last because of Plaintiff and there was
         not enough money to pay health insurance because of Plaintiff.

### FIRST CAUSE OF ACTION
Federal Racketeer Influenced and Corrupt Organizations Act 18 U.S.C § 1962 ( c )

125.     Plaintiff repeats and re-alleges the allegations in the above stated
         paragraphs.

126.     At all times relevant to this Complaint, the defendants each constitute a
         "person" within the meaning of 18 U.S.C. § 1961(3).

127.        Defendants and others not named as defendants herein were associates
            in fact and constituted an "enterprise" within the meaning of 18 U.S.C. §
            1961(4), engaging in and affecting interstate commerce.  The RICO
            Enterprise is a continuing organization that consists of defendants, their
            officers, agents, representatives, and other individuals who assisted in
            devising and implementing their schemes.

128.        At all times relevant to this Complaint, defendants agreed to and did
            conduct and directly participate in, or aided and abetted, the conduct of
            the enterprise's affairs through a patterns of racketeering activity in
            violation of 18 U.S.C. § 1962 ( c ), committing multiple fraudulent and
            illegal racketeering acts, and for the unlawful purpose of intentionally
            defrauding consumers and Plaintiff, including interstate mail fraud in
            violation of 18 U.S.C. § 1341 (Defendant Riverside Liquor); tampering with
            a witness or informant in violation of 18 U.S.C. § 1512(b)-(d) (Defendants
            Riverside Liquor, & the Isners); retaliating against Plaintiff, a witness,
            and/or informant in violation of 18 U.S.C. § 1513(e)-(f) ( Defendants
            Riverside Liquor, & the Isners).   These violations included, but are not
            limited to the acts discussed in the prior paragraphs of this Complaint.
            Defendants engaged in this pattern of racketeering activity for the unlawful
            purpose of and with the effect of defrauding Plaintiff and consumers.

129.      Throughout the relevant time period, the defendants used interstate mail
          and wires to conduct their fraudulent scheme. On information and belief,
          in violation of 18 U.S.C. §1343, all defendants used interstate wires to
          further their contraband sale of liquor scheme.

## SECOND CAUSE OF ACTION

Federal Racketeer Influenced and Corrupt Organizations Act Conspiracy
18 U.S.C. § 1962(d)

130.      Plaintiff repeats and re-alleges the allegations in the above stated
          paragraphs.

131.      This count is brought against all defendants. As set forth above, the
          defendants unlawfully and willfully combined, conspired and agreed to
          violate 18 U.S.C. § 1962 ( c ) specifically, defendant committed overt acts
          in furtherance of the conspiracy as described above.

132.      Defendants have intentionally conspired and agreed to directly and
          indirectly participate in the conduct of the affairs of the enterprise through
          a pattern of racketeering activity. Defendants knew that their acts were
          part of a pattern of racketeering activity and agreed to the commission of
          those acts to further the schemes described above. That conduct
          constitutes a conspiracy to violate 18 U.S.C. § 1962( c), in violation of 18
          U.S.C. § 1962 (d).

133.     As a direct and proximate result of defendant's conspiracy, the overt acts
         taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1862
         (d), Plaintiff has been injured in her business and property in an amount to
         be proven at trial by reason of defendants' violation of 18 U.S.C. § 1962
         (d).  For example, Plaintiff suffered from lost wages, bonuses, benefits
         and incurred incidental and consequential damages and expenses as a
         result of being constructively discharged and boycotted by defendants.

### THIRD CAUSE OF ACTION

Retaliation under Labor Law § 740

134.     Plaintiff repeats and realleges the above stated as though more fully set
         forth herein.

135.     Plaintiff  was hired by defendant in November, 1994 and served as a
         Comptroller until February, 2009.  Throughout the course of her
         employment, Plaintiff performed her job in an exemplary manner.  That
         the activities of defendant, which Plaintiff brought to owner's attention and
         more specifically to the New York State Liquor Authority, urged them to
         investigate, report and correct, were in violation of Chapter 478 of the
         Laws of 1934, known as the Alcoholic Beverage Control Law, rules or
         regulations, and presented a substantial and specific danger to the public
         health or safety of consumers and customers.  The laws rules and
         regulations defendant violated include are set forth above.   As a result of
         Plaintiff's statements and inquiry to defendant, as well as her desire to

stop the ongoing violations by reporting the to New York State Liquor Authority, Plaintiff was constructively discharged from her employment on or about March, 2009.

136.    The facts surrounding Plaintiff's employment and constructive discharge were retaliatory and in violation of Labor Law §740, and Plaintiff is entitled to redress.

137.    As a result of Plaintiff leaving her employment, Plaintiff has lost substantial wages and benefits since March of 2009.

### FOURTH CAUSE OF ACTION
Tortious Interference with Business Relations

138.    Ms. Kapner repeats and realleges the allegations set forth in the above stated paragraphs.

139.    The defendants knew that Ms. Kapner had a valid business relationship with defendant Riverside Liquor.

140.    The defendants intentionally interfered with Plaintiff's valid business relationship by agreeing to compel Plaintiff's termination for refusing to participate in a per se illegal contraband scheme, and then compelling ter termination from Riverside Liquor.

141.     The defendants agreed to compel and then compelled the termination of
         Plaintiff, Ms. Kapner, through threats and coercion as specifically detailed
         in the above stated paragraphs.

142.     The defendants agreed to compel the termination and then compelled the
         termination of Ms. Kapner's employment with malice for the purpose of
         perpetuating the defendant's per se unlawful contraband scheme and
         interfering with Ms. Kapner's business relationship with defendant
         Riverside Liquor.

143.     Ms. Kapner was damaged by the defendants' interference with this valid
         business relationship in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
Tortious Interference with Prospective Economic Advantage

144.     Plaintiff repeats and re-alleges the allegations set forth in the above
         stated Paragraphs.

145.     Ms. Kapner had the expectancy of a valid business relationship with
         manufacturers and distributors of liquor, given her acumen, experience,
         and contacts in the liquor industry.

146.     The defendants knew of Ms, Kapner's expectancy of a valid business
         relationship with manufacturers and distributors of liquor.

147.     The defendants intentionally interfered with Ms. Kapner's expectancy of a

         valid business relationship with manufacturers and distributors of liquor by

         agreeing to a per se unlawful boycott of Ms. Kapner from the industry,

         causing a termination of the expectancy.

148.     The defendants agreed to boycott Ms. Kapner from the liquor industry with

         malice for the purpose of perpetuating the defendants' per se unlawful

         market allocation scheme and interfering with Ms. Kapner's expectancy of

         a valid business relationship.

149.     Ms. Kapner was damaged by the defendant's intentional interference with

         Ms. Kapner's expectancy of a valid business relationship by an amount to

         be determined at trial.


         WHEREFORE, Plaintiff requests relief consistent with the above state causes of
action.

Dated: November 5, 2009
Rochester, New York

                                    CHRISTINA A. AGOLA, PLLC

                        By:

                                    s/:Christina A. Agola, Esq.

                                    Christina A. Agola, Esq

                                    ATTORNEYS FOR PLAINTIFF
                                    28 East Main Street
                                    2100 First Federal Plaza
                                    Rochester, New York 14614
                                    585.262.3320
                                    585.262.3325 (fax)
                                    cagola@agolalaw.com