# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

PATRICIA KAPNER,

                                    Plaintiff,                      DECISION & ORDER

                -vs-

                                                                   09-CV-6565-CJS

RIVERSIDE WINE & LIQUOR, INC., MARCIA
ISNER and BEN ISNER,

                                    Defendants.

---

## APPEARANCES

For Plaintiff:              Christina A. Agola, Esq.
                            1415 Monroe Avenue
                            Rochester, NY 14618
                            (585) 262-3320

For Defendants:             Richard Glen Curtis, Esq.
                            Kaman, Berlove, Marafioti, Jacobstein &
                            Goldman
                            135 Corporate Woods, Suite 300
                            Rochester, NY 14623
                            (585) 325-7440

## INTRODUCTION

**Siragusa, J.** This case, with allegations under New York and Federal law concerning Plaintiff's employment, is before the Court on Defendants' motions (Doc. Nos. 2 & 8) to dismiss and Plaintiff's cross-motion (Doc. No. 15) for an extension of time to comply with W.D.N.Y. Loc. R. Fed. P. 5.1(h). For the reasons stated below, Defendants' motions are granted and Plaintiff's cross-motion is denied.

## FACTUAL BACKGROUND

The Court considers the facts alleged in the complaint as true for its analysis of the pending motions. Plaintiff contends that her causes of action arise from her constructive termination as an employee with Defendants.

### *Pre-resignation events*

Riverside Wine & Liquor, Inc. ("Riverside"), is a wholesale business in the marketing and sales of alcoholic beverages under a license issued by the New York State Liquor Authority. In approximately 1994, Plaintiff's parents, Marcia Isner and Maurice Isner, along with Fredric Schade ("Schade"), took ownership of Riverside as shareholders. Maurice Isner was president and director; Marcia Isner was the secretary, treasurer and a director; and Schade was vice president and director. (Compl. ¶¶ 8-10.) Plaintiff served as an employee of Riverside for 15 years and held the title of controller. (Compl. ¶ 13.)

Plaintiff alleges that from about the year 2000 on, Schade was engaged in covert activities while employed at Riverside. From the allegations in the complaint, he had been importing liquor into the United States illegally under the cover of Riverside's license and sold that liquor independently of Riverside for his own profit. (Compl. ¶¶ 17-27.) Riverside's liquor license does not permit shipment to individuals and does not permit Riverside to sell alcoholic beverages outside of New York State. (Compl. ¶¶ 35 and 40.) However, Schade imported liquor from France and sold it to customers across the United States, in Russia, and the United Kingdom. (Compl. ¶ 41, 46.) Two paragraphs in the complaint describe how Schade conducted his rogue activities:

49. Schade imported the illicit cognac into Riverside's warehouse, where Schade would meet the container of Riverside's usual legal order of cognac,

but in addition, concealed therein and mislabeled, was the illicitly imported cognac.

50. Schade would then secretively remove the illicitly imported cognac, and distribute that throughout the United States, transferring funds back to Benedicte Hardy in France through the U.S. Postal Service, Federal Express and other means.

(Compl. ¶¶ 49 and 50.) On July 22, 2008, Plaintiff, having discovered what Schade was up to, confronted him. On the same day, Schade resigned from Riverside signing a letter that states:

July 22, 2008


I, Fred Schade do hereby resign from Riverside Wine & liquor as of today, July 22. I am relinquishing my stock to the company. Also, I promise to pay all monies I have stolen from the company.

Fred Schade:MI
Vice-Pres.

(Curtis Aff. Ex. G; Compl. ¶ 57.)

At approximately the same time that Schade resigned in July 2008, Plaintiff caused the Corporation to hire an attorney to assist in its investigation of Schade and to protect Riverside and its shareholders. The attorney, William Smith, Esq. ("Smith"), interviewed Glenn Whitney and Curtis Grant ("Grant"), both longtime employees of Riverside. Grant revealed that he was a witness to Schade taking company inventory into his own car and not telling anyone and that it had been going on for ten years. Grant also admitted to preparing Federal Express labels and packaging vintage cognac that illegally came into the United States. Additionally, he admitted to packaging illegal cognac for Riverside drivers to deliver to a private trucking company in Buffalo without the drivers knowing what was in

the packages. Further, Grant admitted to assisting in sending contraband liquor to collectors all over the United States. (Compl. ¶¶ 59-64.) The complaint does not allege that Grant acted with the knowledge of anyone at Riverside except Schade.

Smith advised Marcia Isner to let Grant go, but she decided not to terminate Grant, because he had evidence against Schade. (Compl. ¶ 66.) On August 7, 2008, Plaintiff filed a formal complaint with the New York State Liquor Authority. In September 2008, Riverside commenced a lawsuit against Schade in New York State Supreme Court, which resulted in discovery of 4,000 documents evidencing that Schade had shipped contraband liquor into the country and distributed it in violation of the licensing regulations and laws. (Compl. ¶¶ 72-74.)

In November 2008, Plaintiff alleges that she discovered that a "retailer had been importing the wine using Riverside's import license and bond illegally." (Compl. ¶ 77.) After informing Marcia Isner of this, Plaintiff states that Marcia Isner instructed her to "'do whatever it takes' to bring the wine into the country." (Compl. ¶ 79.) Plaintiff refused. Plaintiff further alleges that once Schade left, her workload increased and that she was assigned as the primary contact with Riverside's legal counsel. Plaintiff alleges that she attempted to have her name put on the company's liquor license through conversations with the New York State Liquor Authority, but Marcia Isner refused consent. (Compl. ¶¶ 85-88.) Plaintiff states that as a result of the increased workload and Marcia Isner's lack of concern about the impact of such increased workload on Plaintiff's health, Plaintiff lost weight and had difficulty sleeping and in January 2009 sought therapy, "to help her deal with the stress and chaos at Riverside." (Compl. ¶ 91.)

Finally, "[i]n January 2009, during a dinner with Marcia Isner, Plaintiff's husband informed Isner that Plaintiff would resign if Isner continued to ignore Plaintiff's request for additional help at Riverside." (Compl. ¶ 92.) Although Riverside did then hire Robyn Bellinger to assist her, Plaintiff alleges that, "despite their exemplary performances, Marcia Isner began to treat Bellinger and Plaintiff in a rude and hostile manner." (Compl. ¶ 94.) In early February 2009, Marcia Isner met with Riverside's legal counsel in the Schade litigation and directed the lawsuit to be withdrawn. When counsel informed the Plaintiff that the lawsuit would be discontinued, "Plaintiff was devastated by this news." (Compl. ¶¶ 95-97.) The complaint then states:

> 99. Because of the continued cloud of illegal activity that now seemed to taint all Riverside directors that could also taint Plaintiff, and the heightened animosity Marcia Isner directed toward Plaintiff, and threats made by Grant against Plaintiff, Plaintiff felt she had no other option but to resign and did so on February 6, 2009.

(Compl. ¶ 99.)

### Post-resignation events

Following her formal resignation, Plaintiff,

> advised Marcia Isner and Riverside in writing that she would complete all work that needed to be done either at Plaintiff's home office using her own computer modern [sic] or after hours when Grant was not on the premises.

> 101. Shortly thereafter, Marcia Isner brought her son, Defendant Ben Isner, into Riverside's operations, who never exhibited any interest in Riverside's work during the 15 years of its operation.

> 102. Instead of being facilitative and collaborative so that Riverside's work could be done, Defendant Ben Isner threatened and harassed Plaintiff, changed passwords from all accounts and locked Plaintiff out of the

company all in an attempt to dissuade her from making further complaints and lor from cooperating with the NYSLA.[1]

103. Henceforth, Plaintiff was unable to complete necessary work for Riverside.

(Compl. ¶¶ 100–03.)

Plaintiff further alleges that Riverside canceled her health insurance, wiretapped her personal phones, computers and fax machines, installed hidden files and malicious spyware, jeopardized her personal credit, and refused to negotiate with her. (Compl. ¶¶ 104–11.)

**The Complaint**

Plaintiff's complaint alleges five causes of action: (1) a claim under the Federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c); (2) conspiracy under RICO, 18 U.S.C. § 1962(d); (3) retaliation under New York State Labor Law section 740; (4) tortious interference with business relations; and (5) tortious interference with prospective economic advantage. Jurisdiction is predicated on the Federal causes of action and Plaintiff has not claimed diversity jurisdiction.[2] (Compl. ¶ 6.) The complaint is dated November 5, 2009 and signed by Christina A. Agola, Esquire.

---

[1] The complaint does not explain why Plaintiff was concerned about the passwords being changed, since Plaintiff had already resigned. The complaint also does not provide Marcia Isner's response, if any, to Plaintiff's offer to continue working, despite having resigned from Riverside, though the clear implication is that Marcia Isner refused Plaintiff's offer.

[2] Plaintiff and all but one defendant reside in New York. (Compl. ¶¶ 2–5.)

In her responding papers, Plaintiff voluntarily withdrew the fourth and fifth causes of action, conceding that they were waived as a result of her claim under New York Labor Law section 740. (Pl.'s Mem. of Law (Feb. 12, 2010) at 25.)

## STANDARDS OF LAW

### Motion to Dismiss

The U.S. Supreme Court, in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), clarified the standard to be applied to a 12(b)(6) motion:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id*. at 1964-65 (citations and internal quotations omitted). *See also*, *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Bell Atl. Corp. v. Twombly*) (footnote omitted); *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) (Indicating that *Bell Atl. Corp. v. Twombly* adopted "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible[,]" as opposed to merely conceivable.)

When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party.

*Burnette v. Carothers*, 192 F.3d 52, 56 (1999), *cert. denied*, 531 U.S. 1052 (2000).  On the other hand, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995)(*citing In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 400-01 n. 3 (2d Cir.1994)). As the Supreme Court clarified in *Ashcroft v. Iqbal*, 556 U.S.662 (2009):

> Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555, (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Iqbal*, 129 S. Ct. at 1949–50.

"In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir., 1991).The Court must view the complaint, and draw all reasonable inferences, in the light most favorable to the non-moving party. *Id.*; *see also* 2 MOORE'S FEDERAL PRACTICE, § 12.34[1][b] (Matthew Bender

3d ed.) (court must accept plaintiff's factual allegations as true). Under the modern rules of pleading, a plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that "all pleadings shall be so construed as to do substantial justice," Fed. R. Civ. P. 8(f). On a Rule 12(b)(6) motion, the issue before the Court "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claim." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995). Finally, while the plaintiff need not set out in detail the facts upon which he bases a claim, he must provide the "defendant fair notice of the nature of the claim and the grounds upon which it rests." *Washington v. James*, 782 F.2d 1134, 1140 (2d Cir. 1986) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957), *abrogated in part by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Where the allegations are so baldly conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, they are meaningless as a practical matter and legally insufficient to state a claim. *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (*citing Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977); *see also Duncan v. AT&T Communications, Inc.*, 668 F. Supp. 232 (S.D.N.Y. 1987) ("individual allegations, although grammatically intact, may be so baldly conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains. Such allegations are meaningless as a practical matter and, as a matter of law, insufficient to state a claim.")

***Loc. R. Civ. P. 5.1(h) (2003)***

The Court notes that Plaintiff has conceded her failure to comply with the local rule, which states in part as follows:

> (h) Any party asserting a claim, cross-claim or counterclaim under the Racketeer Influenced & Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., shall file and serve a "RICO Case Statement" under separate cover as described below. This statement shall be filed contemporaneously with those papers first asserting the party's RICO claim, cross-claim or counterclaim, unless, for exigent circumstances, the Court grants an extension of time for filing the RICO Case Statement. A party's failure to file a statement may result in dismissal of the party's RICO claim, cross-claim or counterclaim. The RICO Case Statement must include those facts upon which the party is relying and which were obtained as a result of the reasonable inquiry required by Federal Rule of Civil Procedure 11....

W.D.N.Y. Loc. R. Civ. P. 5.1(h)(2003); *Barrus v. Dick's Sporting Goods, Inc.*, 732 F. Supp.

2d 243, 259 (W.D.N.Y. 2010). The Court's local rules were amended in January 2011, and

the requirement for a RICO case statement was slightly revised to read as follows:

> Any party asserting a claim, cross-claim, or counterclaim under the Racketeer Influenced & Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, shall file and serve a "RICO Case Statement" under separate cover. This statement shall be filed contemporaneously with the papers first asserting the party's RICO claim, cross-claim or counterclaim, unless the Court grants an extension of time for filing. A party's failure to file a RICO Case Statement may result in dismissal of the party's RICO claim, cross-claim, or counterclaim. The RICO Case Statement must include those facts upon which the party is relying and which were obtained as a result of the reasonable inquiry required by Federal Rule of Civil Procedure 11. In particular, the statement shall conform to the format and numbering that the Court has adopted by Standing Order No. 22.

W.D.N.Y. Loc. R. Civ. P. 9 (Jan. 1, 2011).

## ANALYSIS

In support of their motion to dismiss, and in opposition to Plaintiff's cross-motion for permission to file a late RICO case statement, Defendants raise two arguments: (1) by pleading a claim under New York Labor Law section 740, Plaintiff has waived all other claims, including her Federal RICO claims, and (2) in any event, Plaintiff's Federal RICO

claims should be dismissed as a result of her failure to timely file a locally required RICO case statement.

***Waiver Under New York Labor Law section 740***

The first matter the Court will address is Defendants' contention that Plaintiff has waived *all* other claims by pleading a cause of action under New York Labor Law section 740, New York's Whistleblower law. Since, as indicated above, Plaintiff has voluntarily withdrawn her claims in the fourth and fifth causes of action, the claim under New York Labor Law section 740 is the only remaining state law claim. Accordingly, with respect to this case, the question the Court must answer is whether by pleading a cause of action under section 740, Plaintiff has waived her Federal causes of action. Section 740(7) reads as follows:

> Existing rights. Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any other law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation or under the common law.

N.Y. Labor Law § 740(7) (McKinney's 1984). Plaintiff, relying on *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126 (2d Cir. 2007) and *Collette v. St. Luke's Hosp.*, 132 F. Supp. 2d 256 (S.D.N.Y. 2001), argues that section 740(7) does not operate to wave her Federal claims. It is true that in dictum, the Second Circuit, referring to section 740(7), observed: "federal courts have interpreted the provision not to waive or otherwise affect rights arising under federal law." *Reddington*, 511 F.3d at 134 (citations omitted). However, *Reddington* involved questions arising under New York Labor Law sections 740 and 741

and did not address the issue presented in this case, *i.e.*, the effect of section 740(7) on Federal claims. *Id*., at 128.

In any event, the Court agrees with the well-reasoned decisions of the district courts in *Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256 (S.D.N.Y. 2001) and *Reddington v. Staten Island Univ. Hosp.*, 373 F. Supp. 2d 177 (E.D.N.Y. 2005), that Federal claims are *not* waived by a plaintiff who makes a section 740 claim. In that regard, in *Reddington*, the Eastern District, after carefully reviewing the district court's decision in *Collette*, and other cases interpreting the waiver provision, wrote:

> With respect to the effect of the waiver under § 740(7) on federal claims, defendants argue that plaintiff is precluded from pursuing her ADEA claim…. Nevertheless, the Court is persuaded by the determination in *Collette* that a cause of action under § 740 does not  act as a waiver of federal causes of action because "an effort by New York to condition a state law right on the waiver of arguably unrelated *federal* rights would raise serious constitutional questions." 132 F. Supp. 2d at 265 (emphasis in original). *See also Nicholls*,[3] 2004 U.S. Dist. LEXIS 12816, 2004 WL 1533831, at *6 ("Holding that the waiver does not apply to claims under federal law, avoids serious federal constitutional problems, which would be raised were a state statute to nullify a federal provision."). Therefore, the Court denies defendants' motion to dismiss plaintiff's ADEA claim.

*Reddington*, 373 F. Supp. 2d at 187–88. Therefore, the Court rejects Defendants' argument that by pleading a cause of action under section 740, Plaintiff here has waived her Federal causes of action.

**RICO Case Statement**

The Court now turns its attention to Defendants' second argument, that Plaintiff has failed to establish excusable neglect or exigent circumstances for her failure to timely file

---

[3]*Nicholls v. The Brookdale Univ. Hosp. Med. Cntr.*, No. 03-CV-6233 (JBW), 2004 U.S. Dist. LEXIS 12816 (E.D.N.Y. Jul. 9, 2004).

the required RICO case statement. Western District of New York Local Rule of Civil Procedure 9, as previously detailed, requires that a RICO case statement be filed contemporaneously with the complaint, "unless, for exigent circumstances, the Court grants an extension of time for filing the RICO Case Statement." Here, Plaintiff filed her complaint on November 10, 2009, signed by her counsel, Christina A. Agola, Esq. However, Plaintiff did not provide the requisite RICO case statement, nor did she move for an extension of time to file such statement, until February 12, 2010, more than two months after Defendants' initial motion to dismiss alerted her to its absence, and three months after the filing of the complaint.

Pursuant to Federal Rule of Civil Procedure 6(b)(1)(B), a party must show excusable neglect to extend a deadline that has already passed. In her motion, Plaintiff's counsel asserts in a declaration in support of her motion to extend the deadline that, "Plaintiff's failure to comply with Local Rule 5.1(h) constitutes excusable neglect." (Agola Decl. ¶ 3.) In an unsworn Memorandum of Law filed in support of her motion, Ms. Agola asserts, "Plaintiff did not file her RICO Case Statement because of *office* neglect." (Pl.'s Mem. of Law at 2 (emphasis added).) Also in the unsworn memorandum, Ms. Agola asserts that,

> Between the time Plaintiff filed her Complaint until present [Feb. 12, 2010], Plaintiff's counsel underwent personnel changes in her office, causing the office to run short-staffed for the aforementioned time period. More specifically, it was presumed that the outgoing lawyers assigned to Plaintiff's case had filed Plaintiff's civil RICO Case Statement upon their departure. Plaintiff's counsel subsequently received notice of failure to comply with Local Rule 5.1(h) upon the filing of Defendants' instant motion.

(*Id.* at 2–3.)

In addressing excusable neglect in a similar context (Bankruptcy Rule 9006(b)(1),

which parallels Fed. R. Civ. P. 6(b)(1)(B)), the Supreme Court held:

> Because Congress has provided no other guideposts for determining what sorts of neglect will be considered "excusable," we conclude that the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include, …, the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Following

the decision in *Pioneer*, the Second Circuit decided *Canfield v. Van Atta Buic/GMC Truck*,

127 F.3d 248 (2d Cir. 1997), in which it wrote:

> As one court explained it, *Pioneer* "noted that 'inadvertence, ignorance of the rules, or mistakes construing the rules do not *usually* constitute 'excusable neglect.' Thus, although a late filing will ordinarily not be excused by negligence, that possibility is by no means foreclosed." *Id*. (quoting *Pioneer*, 507 U.S. at 392 (emphasis added)) (footnote omitted). In accordance with that holding, a finding that the failure to comply with a filing deadline was excusable may in some circumstances be appropriate. For example, neglect may be excusable where the language of a rule is ambiguous or susceptible to multiple interpretations, or where an apparent conflict exists between two rules. Other grounds may exist, but we need not canvass them today. *See generally Pioneer*, 507 U.S. at 395 (listing some factors relevant to an equitable determination of excusable neglect).
>
> *But we do not believe that the possibility that a court may properly find excusable neglect on such grounds alters the principle that failure to follow the clear dictates of a court rule will generally not constitute such excusable neglect. We are not alone in that view. See, e.g., Kyle v. Campbell Soup Co.*, 28 F.3d 928, 931-32 (9th Cir. 1994) (holding that, where counsel failed to offer a persuasive justification for failing to comply with Fed. R. Civ. P. 6(e) and local court rules, there was "no basis for deviating from the general rule that a mistake of law does not constitute excusable neglect"). And, we have not hesitated to reiterate the old rule at the same time that we have applied *Pioneer's* equitable test in determining whether failure to comply with a filing

deadline constituted excusable neglect. *See, e.g., Weinstock*, 16 F.3d at 503 (quoting *Cosmopolitan Aviation's* statement of the pre-*Pioneer* automatic rule, but then engaging in an "equitable determination" taking into account "all relevant factors"). Where, as in *Weinstock*, the rule is entirely clear, we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer* test.

*Canfield*, 127 F.3d at 250–51 (emphasis added); *see also Redhead v. Conf. of Seventh-Day Adventists*, 360 Fed. Appx. 232, 235 (2d Cir. 2010) ("As this Court has stated, 'we and other circuits have focused on the third factor,' noting that where ''the rule is entirely clear, we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer* test.''").

Here, as to the third factor of *Pioneer*, "the reason for the delay, including whether it was within the reasonable control of the movant," *Pioneer*, 507 U.S. at 395, Ms. Agola has offered no explanation other than "office neglect." (Pl.'s Mem. of Law (Docket No. 15-3) at 2.) As the Southern District of New York observed in *Shervington v. Vill. of Piermont*, 732 F. Supp. 2d 423 (S.D.N.Y. 2010): "Law office failure rarely constitutes an excusable neglect." This is especially so under the facts and circumstances of this case where the local rule, requiring contemporaneous filing of the RICO case statement is crystal clear. W.D.N.Y. Loc. R. Civ. P. 9 ("This statement shall be filed contemporaneously with the papers first asserting the party's RICO claim, cross-claim or counterclaim, unless the Court grants an extension of time for filing."); *Canfield*, 127 F.3d at 250–51 ("neglect may be excusable where the language of a rule is ambiguous or susceptible to multiple interpretations, or where an apparent conflict exists between two rules").

Moreover, here, Ms. Agola offers no explanation for why *she* did not notice the missing RICO Case Statement when *she*, not some "outgoing lawyer[]," signed the

complaint.[4] Ms. Agola's contention that her *office* failed, makes no sense in this context of this case. Considering the factors outlined in *Pioneer*, and with the guidance provided by *Canfield*, the Court does not find excusable neglect for Plaintiff's failure to file the RICO case statement contemporaneously with the complaint, nor does it find exigent circumstances justifying an extension of time. The local rule was, and is, clear and unambiguous. Accordingly, the cross-motion for an extension of time to file the RICO Case Statement (Doc. No. 15) is denied. Consequently, Plaintiff's first and second causes of action, plead under the RICO statute, are dismissed.

### RICO Claims

Even if the Court had not dismissed the RICO claims because of Plaintiff's failure to file the required RICO Case Statement contemporaneously with the complaint, it would nevertheless dismiss those claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action. Plaintiff claims that she was constructively discharged because she reported Schade's illegal importation of contraband.

The RICO statute provides a civil right of action to "any person injured in his business or property by reason of a violation of section 1962…." 18 U.S.C. § 1964(c). The Supreme Court in *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 988–89 (2010), discussed its prior holding in *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992):

---

[4]Moreover, Ms. Agola offers no details of who the "outgoing lawyers" were, when they left her employment. Further, as Defendants point out in their memorandum of law, Ms. Agola's office, despite the "outgoing lawyers," had sufficient staffing to be able to file eight other lawsuits in the Western District of New York at about the same time this lawsuit was commenced.

> to state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id*., at 268. Proximate cause for RICO purposes, we made clear, should be evaluated in light of its common-law foundations; proximate cause thus requires "some direct relation between the injury asserted and the injurious conduct alleged." *Ibid*. A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient. *Id*., at 271, 274.

*Hemi Group*, 130 S. Ct. at 989 (quoting *Holmes*). In the lawsuit at bar, Plaintiff alleges that because of Schade's racketeering activities, specifically mail fraud, she was injured by being constructively discharged. (Pl.'s Mem. of Law at 21.) In *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634 (2d Cir. 1989), the late Justice Van Graafeiland wrote that the phrase in the RICO statute, "by reason of," "requires that there be a causal connection between the prohibited conduct and plaintiff's injury." *Id*. at 636. He cited favorably to the decision in *Cullom v. Hibernia Nat'l Bank*, 859 F.2d 1211, 1213 (5th Cir. 1988). Both in *Cullom* and in *Norman*, an employee plaintiff was suing because of a constructive discharge as a result of refusing to participate in racketeering activities. However, as the Fifth Circuit plainly stated, "[w]histle blowers do not have standing to sue under RICO for the injury caused by the loss of their job." *Cullom*, 859 F.2d at 1215. *Cullom* cited to *Sedima v. Imrex Co.*, 473 U.S. 479, 495 (1985), in which the Supreme Court wrote, "[i]f the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)."

Analogous to the situation in *Cullom* and *Norman*, Plaintiff here was injured not as a result of Schade's importation of cognac from France, nor as a result of the shipment of that cognac to individual buyers in the United States, Russia or the United Kingdom, nor

because Schade's sales benefitted only Schade. Rather, she was allegedly injured: because Schade resigned and her workload increased (Compl. ¶¶ 82 & 92); because Marcia Isner "continued to ignore [her] request that qualified help be hired to assist with the increasing backlog of work," (Compl. ¶ 90); because Plaintiff and the help eventually hired were treated in a "rude and hostile manner" by Marcia Isner (Compl. ¶ 94); because "Plaintiff was devastated" when Marcia Isner, one of the shareholders and treasurer of the corporation, discontinued the lawsuit against Schade (Compl. ¶¶ 95–97); because of the "cloud of illegal activity" which Plaintiff felt was tainting the corporation; because of the "heightened animosity Marcia Isner directed toward her"; and because of "threats made by Grant against Plaintiff" (Compl. ¶ 99). It is nowhere alleged that the racketeering activity was the proximate cause of Plaintiff's resignation from Riverside. Consequently, she has not stated a cause of action under the RICO statute. *Cullom*, 859 F.2d at 1217 ("[B]eing discharged for either reporting a RICO violation or refusing to participate in a RICO violation does not flow from the predicate acts…·").

Further, Plaintiff's conspiracy claim under the second cause of action in her complaint cannot stand independently of the insufficient RICO claim plead in the first cause of action. First, as discussed above, Plaintiff has not alleged harm to herself that was proximately caused by the conspiracy. Second, Plaintiff has not plead the necessary elements of a RICO conspiracy. In *United States v. Pizzonia*, 577 F.3d 455 (2d Cir. 2009), the Second Circuit discussed the necessary allegations for RICO conspiracy under 18 U.S.C. § 1962(d):

> As this court emphasized in *United States v. Persico*, 832 F.2d 705 (2d Cir.1987), "the agreement proscribed by section 1962(d) is [a] conspiracy to

> participate in a charged enterprise's affairs" through a pattern of rackete-
> ering, "not [a] conspiracy to commit predicate acts," *id.* at 713.

*Pizzonia*, 577 F.3d at 463. The *Persico* court stated:

> In order to convict a defendant of RICO conspiracy, only an agreement to
> commit two or more predicate acts, rather than the acts themselves, need be
> proven…. By his agreement, a RICO defendant signals his membership in
> a conspiracy to conduct the affairs of the charged enterprise. Thus, the RICO
> conspiracy statute is most closely analogous to other conspiracy statutes
> pursuant to which overt acts in furtherance of the conspiracy need not be
> pleaded or proven….

*Persico*, 832 F.2d at 713. In paragraph 132 of the complaint, Plaintiff alleges in conclulsory

fashion:

> 132. Defendants have intentionally conspired and agreed to directly and
> indirectly participate in the conduct of the affairs of the enterprise through a
> pattern of racketeering activity. Defendants knew that their acts were part of
> a pattern of racketeering activity and agreed to the commission of those acts
> to further the schemes described above. That conduct constitutes a
> conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

(Compl. ¶ 132.) Those allegations compare to the ones alleged in *Hecht*, which the Second

Circuit found insufficient, even under the more liberal Federal Rule of Civil Procedure 8

pleading standards:

> Paragraph 105 of the complaint alleges that defendants were "conspiring
> with agents, servants, and employees and others to conduct their affairs
> through a pattern of racketeering activity; ... [and were] conspiring to violate
> provisions of [section] 1962(a),[ ](b) and (c)." It does not allege facts implying
> any agreement involving each of the defendants to commit at least two
> predicate acts. Because the core of a RICO civil conspiracy is an agreement
> to commit predicate acts, a RICO civil conspiracy complaint, at the very least,
> must allege specifically such an agreement. *See Rose v. Bartle*, 871 F.2d
> 331, 366 (3d Cir. 1989) (must plead agreement to commit predicate acts and
> knowledge that those acts were part of a pattern of racketeering activity in
> violation of section 1962(a)-(c)); *Morin v. Trupin*, 711 F. Supp. 97, 111 (S.D.
> N.Y. 1989) (must plead agreement and that defendants understood scope

> of enterprise and knowingly agreed to further its affairs through commission
> of offenses); *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*,
> 660 F. Supp. 1362, 1372 (D. Conn. 1987) (must plead knowing agreement
> to commit predicate acts).

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25–26 (2d Cir. 1990). As was the case in *Hecht*, under Rule 8, Plaintiff has not plead a plausible claim for a RICO conspiracy.[5]

### Jurisdiction

Plaintiff predicated jurisdiction in this Court on her Federal claims plead in the first and second causes of action. (Compl. ¶ 6.) As the complaint now stands, there is no basis for diversity jurisdiction, since Plaintiff and two of the three defendants are residents of New York. Because the Court is dismissing the two Federal causes of action, no independent basis remains for jurisdiction in this court. Pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise jurisdiction over the sole remaining claim under New York Labor Law section 740.

### CONCLUSION

Plaintiff's cross-motion for an extension of time to file a RICO Case Statement (Doc. No. 15) is denied. Defendants' motions to dismiss the RICO claims (Doc. Nos. 2 & 8) in the first and second causes of action are granted and those claims are dismissed with prejudice. Plaintiff has withdrawn her fourth and fifth state common law causes of action. Pursuant to 28 U.S.C. § 1367(c)(3) (1990), the Court declines to exercise jurisdiction over

---

[5]Because of its determination that Plaintiff has not plausibly plead any causes of action under the Federal RICO statute pursuant to the more liberal pleading standards under Federal Rule of Civil Procedure 8, the Court need not address Defendants' arguments that Plaintiff's complaint fails to meet the pleading standard under Federal Rule of Civil Procedure 9 for fraud.

the remaining state law claim in the third cause of action. The Clerk is directed to enter

judgment and close this case.

IT IS SO ORDERED.

Dated:   October 28, 2011
         Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J.  SIRAGUSA
United States District Judge